IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**LA SHAWN WILSON**

      Plaintiff,

CASE NO:

Vs

**BENEFYTT TECHNOLOGIES, INC.**

      Defendant(s).

_____/

**COMPLAINT**

COMES NOW, the Plaintiff, LASHAWN WILSON (Plaintiff), by and through her undersigned counsel, and files this Complaint against the BENEFYTT TECHNOLOGIES, INC. ("the BENEFYTT") and alleges:

**A. Jurisdictional Statement**

1. The U.S. District Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2. That the federal question involved in this case arises under 42 U.S.C. Section 1981 ("Deprivation of Civil Rights").

3. That the Plaintiff is a resident of St. Petersburg, Pinellas County, Florida. She is black/African American.

4. That the Defendant is a private corporation and with its principal operation in Tampa, Hillsborough County, Florida.

## STATEMENT OF FACTS

### Introduction

5. The Plaintiff, Ms. LaShawn Wilson, is a 53 year old African American woman.

    a. Ms. Wilson holds an Associates degree from American Intercontinental University.
    b. Ms. Wilson holds the Professional in Human Resources (PHR) and Project Management professional certifications.
    c. Ms. Wilson has worked in the field for human resources for 20 years.[1]

6. Benefytt Technologies, Inc. hired Ms. Wilson for the position of Human Resources Site Manager on March 3, 2021, and assigned her to the South Tampa office, 3109 Dr. MLK Jr Blvd, 4th Floor, Tampa, FL 33607.

7. The position of Human Resources Site Manager required Ms. Wilson to perform the following job functions and duties:

    a. Essential Duties and Responsibilities:

        (1). Onboarding of new employees

        (2). Creates, maintains and audits employee personnel records

        (3). Provide counsel on employee relations matter abiding by our company policies, values and the directives of the VP, Human Resources

        (4). Executes routine tasks in delicate circumstances such as providing reasonable accommodations, investigating allegations of wrongdoing, and terminations.

        (5). Work closely with the VP of Human Resources to ensure compliance with labor laws, employee relations, policies and procedures; documents human resources actions

        (6). Assist with explanation and administration of employee benefits programs

---

[1] Furthermore, Ms. Wilson has a stellar professional and career history, having worked in the following industries: manufacturing, government contracting, financial/banking, retail and call center; and for the following employers: HSN, Ceridian, Franklin Templeton, Raytheon, and SOSi (formerly, Vykin Corporation). She has never been terminated from employment at any of her prior employers. She has always worked in a racially and ethnically-diverse working environments, and has never been disciplined, let alone terminated, for failing to communicate effectively with others in the workplace, or for not getting along with others in the workplace.

      (7).    Offboarding of employees, including exit interviews

      (8).    Assist HR leadership with the annual performance review process, open enrollment, and other tasks as assigned Monitor unemployment claims and employment verification requests

      (9).    Assist with corporate online/CBT training initiatives

      (10).    Workplace Announcements as necessary/directed

      (11).    Provides support to other members of the HR team as directed

      (12).    Ad hoc responsibilities as directed

8.    From between March 23, 2021 (date of hire) and August 12, 2021 (date of termination), Plaintiff Wilson did, in fact, fully perform these job duties.

    A.    During Ms. Wilson's tenure with the Defendant Benefytt Technologies, she fully met her employer's reasonable expectation of employment.   The totality of the circumstances will clearly show this. Evidence in any pretrial discovery before the U.S. District Court will also demonstrate the following:

      (1).    That Ms. Wilson extended   approximately 200 (possibly more) offers to candidates and onboarded/oriented the same number;

      (2).    That she created a PowerPoint presentation for orientation that is currently used in the Tampa and Lake Mary, Florida offices;

      (3).    That she streamlined the onboarding process of collecting new hire paperwork and I-9 documents, for the internal onboarding team members;

      (4).    That she extended internal promotional and lateral transfer offers and processed status changes for internal employees;

      (5).    That she recorded and reported five worker's compensation claims to the company's WC vendor and investigated countless employee relations concerns, ranging from allegations of inappropriate touching, harassment, sexual harassment, attendance and performance issues, to mediating difficult conversations with supervisors and their direct report;

      (6).    That she interacted with all levels of leadership within the call center division, provided coaching to supervisors and advised management on HR policies and procedures and made recommendations for disciplinary action up to and including termination of employees.

9. **Ms. Wilson's Initial Concerns Regarding Unprofessional Behavior from Coworkers**

   A. Ms. Wilson was the second-highest ranking African American in the Human Resources Department, behind the Vice President, John Parker.

   B. During the month of April, Ms. Wilson had a conversation with my manager, John Parker about the way some of the HR team members' (all of whom are white or non-black) communications were perceived to be abrupt, rude and unprofessional.

   C. She showed Mr. Parker printed emails to illustrate her point. Mr. Parker said that he would talk to the staff members.

10. **Response and Counter-Complaints by Ms. Wilson's White or Non-Black Co-Workers**

   A. In May 2021, while Ms. Wilson was in the Headquarters office, (3450 Buschwood Park, Suite 200, Tampa, FL 33618), Mr. Parker informed her that a few of the HR HQ team complained that she did not speak to them whenever she came to the HQ office.

   B. Mr. Parker said that Ms. Wilson should speak to her co-workers so that they don't think that Ms. Wilson has something against them. Ms. Wilson told Ms. Parker when she comes to the office (HQ), that she was "focused on work" and that she does not have anything against her co-workers.

   C. Mr. Parker then decided everyone needed to meet and have a discussion. A meeting was held. Present in the meeting were members of the payroll team, Ms. Wilson, HR Site Manager for Lake Mary, FL and John Parker.

   D. A few minutes into the meeting, the HR Manager for Lake Mary left the room and shortly thereafter, so did Mr. Parker. The payroll team told Ms. Wilson that they did not think Ms. Wilson was communicating with them.

   E. Ms. Wilson asked her co-workers what communications were missing? Ms. Wilson also told her co-workers that their email communications were "rude, curt and unprofessional."

   F. She explained to them that she was extremely busy and needed help with some of the administrative tasks due to payroll, to which it was determined, the newly hired payroll specialist would assist. They left the meeting with an understanding that they all would communicate better and try to work together.

G. On July 15, 2021, Ms. Wilson had a conversation with Mr. Parker asking him why Ms. Wilson was not consulted on a concern that involved an employee in the workgroup to which Ms. Wilson provided HR support. During the discussion, Mr. Parker stated out, "Deidre Javarone didn't come to you because she thinks you are unapproachable."

H. Furthermore, Mr. Parker continued, saying "and the payroll team says that you don't communicate with them." Based upon this response, it is quite obvious that the previous "communication problem" within the office was not resolved.

I. Ms. Wilson was "shocked," because she was not aware the payroll team members felt this way and basically stated so to Mr. Parker. She further told Mr. Parker that the payroll specialist is never in the office, and that she had not seen her at all during that week, and maybe once within the past two weeks in total.

J. As for being "unapproachable," Ms. Wilson does not work in the same office as Deidre and so, from a practical standpoint, there would not be a need for a regular, routine, or daily "approach" – in a word, no need for particular co-worker to feel so uncomfortable with simply walking up to, and speaking with, Ms. Wilson.

K. This "vague" and "unclear" grievance, which was fully ratified by the HR V.P., John Parker, is clearly indefensible under § 1981 or Title VII—since clearly this leaves the "minority" at the mercy of the "majority," and thus drives the minority out of the labor market.

11. **V.P. of Human Resources John Parker Acted with Callous Indifference toward Ms. Wilson's Constitutional and Legal Right to Liberty of Occupational Pursuit and to Make and Enforce Contracts**

A. For this reason, on the following day, July 16, 2021, Ms. Wilson sent an email to Mr. Parker as she was concerned and uncomfortable about the exchange and the perception of her by the entire team. **Exhibit A** (Email from LaShawn Wilson to John Parker).

B. Mr. Parker did not acknowledge Ms. Wilson's email. About one week after Ms. Wilson sent the email to Mr. Parker, she asked him if he received her email. He stated, "Yes, I am still digesting it and not ready to talk about it." However, another two weeks went by without acknowledgement or follow up.

C. On August 2, 2021, Ms. Wilson sent a meeting request via Microsoft Outlook which Mr. Parker declined, saying he was driving to the South Florida office (call center). He sent Ms. Wilson a message via Microsoft Teams and said he would be "happy to talk on his drive down south."

5

      D.     He did not talk to Ms. Wilson, during his drive down south. However, unbeknownst to Ms. Wilson, at the time, an HR team member was in the car with him driving down south. And so, the meeting would not have been private or confidential.

      E.     The fact that another HR team member was privy to that conversation also denotes Mr. Parker's callous indifference toward Ms. Wilson's concerns or constitutional rights and displayed Mr. Parker's sense of pre-judgment and favoritism towards Ms. Wilson's co-workers.

      F.     Ms. Wilson informed Mr. Parker that she wanted to meet, but could wait until he returned.   On August 6, 2021, Ms. Wilson sent a follow up email asking when Mr. Parker would have time to meet to discuss the email that she sent July 16, 2021.

      G.     On August 10, 2021, Mr. Parker sent a "meeting request" for Friday, August 13, 2021, 2:00pm.   However, at the end of the day, August 12, 2021, Mr. Parker and two other members of the HR team (HR Coordinator and Payroll Specialist) were present in the South Tampa Call Center. On that date, Mr. Parker, with an H.R. Coordinator present (Deidre Javarone), terminated Ms. Wilson's employment.

      H.     Mr. Parker told Ms. Wilson that the reason that she was terminated was because she "was not a good fit."   Ms. Wilson told Mr. Parker that she believed that her termination to be retaliation for having complained about the payroll team's communication style in April.

      I.     But Mr. Parker said that he also received "complaints from vendors about you." Ms. Wilson asked "what vendor?" and "what was I alleged to have said?" Mr. Parker said the benefit vendor complained to him that Ms. Wilson complained to the benefit vendor about the process of employees enrolling in benefits.

      J.     Ms. Wilson does remember having a conversation with that person in June or July.   Mr. Parker also complained that when he would add the payroll specialist's name to an email, that Ms. Wilson would remove it.

      K.     Ms. Wilson asked him for specifics and he said, "the decision has been made, that's not what we do here." Mr. Parker also mentioned telling the payroll team that they were to be included in emails or were to assume certain tasks or roles.

      L.     However, Mr. Parker never communicated this to Ms. Wilson. Nevertheless, Mr. Parker accused Ms. Wilson of not including the payroll team on emails, which prevented them from doing their tasks. When Ms. Wilson asked Mr. Parker to provide her with examples of any or all of this, he stated, "the decision has been made."

    12.    Under the common law of Florida, an employer has a duty to provide a *reasonable amount of supervisory directions* and *supervisory instructions* to the employee, so

that the employee can have *a reasonable opportunity* to carry out those job functions. This is the common law duty of supervision.

       A.     Under the law of Title VII of the 1964 Civil Rights Act (and § 1981), this common law duty to provide supervisory directions may be interposed by an employee who has been terminated for failing to perform job duties and functions, as part and parcel of a *prima facie* case of racial discrimination.

       B.     For this reason, Plaintiff Wilson hereby interposes this "breach of common law duty to provide supervisor directions" in her prima facie claim of racial discrimination. The Defendant Benefytt Solutions, LLC terminated Plaintiff Wilson for failing to perform job duties, but, when the Plaintiff asked for feed-back, clarification, and recommendation for how to properly perform her job, the Defendant, so as to impede Plaintiff's successful job performance and execution, refused to provide any supervision.

       C.     Moreover, for the reasons stated below, the Defendant treated Plaintiff Wilson far less favorably than similarly-situated white employees, in violation of 42 U.S.C. § 1981.

       D.     For this reason, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Wilson shall seek a summary judgment order in her favor, forthwith.

### COUNT I.   RACIAL DISCRIMINATION IN EMPLOYMENT
### 42 U.S.C. SECTION 1981

13.     The Plaintiff Wilson hereby re-alleges and re-states averments 1 through 12, which should be read as a complete sub-part to this claim for relief, as per Rule 8 of the Fed.R.Civ.P.

14.     Plaintiff Wilson is black/ African American and, as such, she is a member of a protected class.

15.     Plaintiff Wilson is fully qualified to perform the position of Human Resources Site Manager.

16.     Plaintiff Wilson initiated an informal report to her supervisor regarding a breakdown in communications between herself and her white or non-black co-workers.   Plaintiff

Wilson sought recommendations from her supervisor as to how to resolve this problem. Afterwards, Plaintiff's white or non-black coworkers responded by stating that Plaintiff caused the communication breakdown, but the Supervisor, notwithstanding the Plaintiff's requests, refused to facilitate a resolution of this communication problem. The Defendant selectively and discriminatorily terminated Plaintiff Wilson, but it did not terminate the said non-black or white co-employees.

17. The Defendant supervisor had a common-law duty to provide reasonable instructions to Ms. Wilson to permit her to perform her job. For Ms. Wilson to perform her job, she needed to communicate with her co-workers—as a term, condition, and privilege of employment. To that end, Ms. Wilson sought advice and reasonable instructions from Mr. Parker as to how to communicate effectively and properly with her white or non-black coworkers. However, the Defendant refused to provide such instructions, and treated the Plaintiff far less favorably than he treated Ms. Wilson's similarly-situated white co-workers who, for all intents and purposes, reported the same communication breakdown.

    A. There was a communication breakdown between (1) a black employee and (2) several white/ non-black employees.

    B. Without any business justification, the Defendant resolved this communication break-down issue by terminating the black employee—i.e., Plaintiff Wilson.

    C. There is no evidence that the Defendant ever took the time to explain to Ms. Wilson as how to discharge a term, condition, and privilege of her employment (i.e., communication with co-workers).

    D. Moreover, the Defendant had a legal duty to protect Plaintiff Wilson from

racial ostracism, racial exclusion, racial harassment, and racial segregation in the workplace (i.e., all forms of racial discrimination in the terms, conditions, and privileges of employment), whether by co-employees or customers. The Defendant breached this duty, and as such, it discriminated against Plaintiff Wilson because of her race.

    18.    WHEREFORE, the Plaintiff Wilson demands:

        A.    Trial by jury.

        B.    Judgment against the Defendants for compensatory damages.

        C.    Affirmative Action, as deemed appropriate by the Court.

        D.    Injunctive Relief, as deemed appropriate by the Court.

        E.    Attorney's fees and costs.

        F.    For whatever additional relief as is deemed just and appropriate by this honorable Court.

RESPECTFULLY SUBMITTED:

__/s/ Roderick O. Ford_____
Roderick O. Ford, Esq.
FBN: 0072620
THE METHODIST LAW CENTRE
5745 S.W. 75th Street
Suite 149
Gainesville, Florida 32608
(813) 223-1200
(800) 792-2241 facsimile
admin@methodistlawcentre.com